# EXHIBIT "E"

Pennsylvania Police Accreditation Coalition

 **Pennsylvania Police Accreditation Coalition**



**EXHIBIT**

Home     News     Links     Contact



Dedicated to Commonwealth Law Enforcement Professionalism through Ac

Home

Home
News
Links
Contact Us
Search
Bylaws
Executive Board
Membership Benefits
Membership Categories
Membership Application
Member Agencies

**Meeting Schedule**



| | | June 2008 | | | | |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**CB Login**
Username

Password

☐ Remember me
Login
Lost Password?

### History of Pennsylvania Police Accredi Coalition

Written by Web Master
Monday, 17 September 2007

The Pennsylvania Police Accreditation Coalition is a governmental coalition group whose membership enforcement agencies and other organizations int participating in law enforcement accreditation.

PPAC was founded in 1990 to provide guidance an law enforcement agencies pursuing accreditation t Commission on Accreditation for Law Enforcement (CALEA), a nonprofit organization based in Fairfax

With the creation of the Pennsylvania Law Enforce Accreditation Commission (PLEAC) by the Pennsyl Police Association in 2000, PPAC widened its focus law enforcement agencies dedicated to the Comm accreditation program.

From its inception, PPAC has continued to represe of Commonwealth law enforcement agencies by:

Promoting the adoption of quality policies and pro law enforcement agencies.
Providing guidance, information and direct assista agencies participating in the CALEA accreditation s including organizing and conducting preliminary or accreditation assessments.
Serving as a forum for the generation of ideas and information on accreditation and a wide range of c

Pennsylvania Police Acceditation Coalition                                    Page 2 of 2

No account yet? Register

contemporary law enforcement topics.
Advocating the establishment of state law enforce
accreditation program to serve the needs of Comn
enforcement agencies.

Last Updated ( Wednesday, 26 September 2007 )

### Newsflash 1                    ### Newsflash 2

Written by Administrator            Written by Adminisi
Monday, 09 August 2004              Monday, 09 August 20

Joomla! 1.0 - 'Experience the       Last Updated ( Wec
Freedom'!. It has never been        2008 )
easier to create your own
dynamic site. Manage all your
content from the best CMS
admin interface.

**More...**
Newsflash 3





# Pennsylvania Law Enforcement Accreditation

## Standards and Practices

April 26, 2007

**1.1.1** - A written directive requiring all law enforcement personnel, prior to performing their sworn duties, to take and subsequently abide with an Oath of Office to support, obey, and defend the Constitution of the United States and the Pennsylvania Constitution and the laws of Pennsylvania and the governmental subdivision.

Newly hired law enforcement officers, in a manner prescribed by the agency, shall also acknowledge that they will uphold, obey and enforce the law without consideration to a person's race, color, sex, religious creed, sexual orientation, age, national origin, ancestry, handicap or disability.

**1.2.1** – Written directives identifying the following:

a. statutory authorizations for the law enforcement agency as prescribed by the laws of the Commonwealth of Pennsylvania or other applicable statutes or ordinances; and

b. statutory authorizations that provide for the legal authority for its law enforcement officers to perform their duties under the law. This should include a reference for the authorization for the law enforcement officers to carry and use weapons in the performance of their duties.

**1.2.2** - A written directive governing procedures for assuring compliance with all applicable constitutional requirements for in-custody situations, including, but not limited to:

a. interviews and interrogations;

b. access to counsel; and

c. search and seizure

**1.2.3** - A written directive governing search and seizure without a warrant by agency personnel, to include the following situations:

a. search by consent;

b. stop and frisk of an individual under circumstances where the officer has legally articulable reasons to fear for his/her safety;

c. search of a vehicle under a moveable vehicle exception;

d. at the scene of a crime;

e. exigent circumstances, as when the public safety is endangered;

f. inventory searches of seized vehicles or other property; and

g. other situations authorized or governed by United States and Pennsylvania

**1.2.4** - A written directive specifying the legal requirements and procedures for any physical arrest, completed with or without an authorized warrant.

**1.2.5** - A written directive that governs procedures for strip and/or body cavity searches that include:

a. authority for conducting such searches with and without a search warrant;

b. privacy provisions with search by same gender; and,

c. any required reporting procedures when such searches are conducted.

**1.3.1** - A written directive stating that agency personnel shall only utilize the force necessary to effect lawful objectives in conformance to the provisions of the Pennsylvania Crimes Code, other Pennsylvania statutory provisions, and applicable Pennsylvania and Federal Court Decisions. The directive shall refer to authorized use of force options and their appropriate application.

**1.3.2** - A written directive stating that a "peace officer" (law enforcement officer) as defined in Chapter 5 of the Pennsylvania Crimes Code (18 Pa. C.S.A. §501) shall only utilize deadly force when necessary and justified to effect lawful objectives in conformance to the provisions of the Pennsylvania Crimes Code, other Pennsylvania statutory provisions, and Pennsylvania and Federal Court decisions.

**1.3.3** - If the law enforcement agency permits the use of firearm "warning shots" by agency personnel, the agency shall have a written directive governing their use. Otherwise, the agency shall have a written directive prohibiting the discharge of "warning shots" by agency personnel.

2

**1.3.4** – A written directive governing the circumstances when law enforcement personnel are justified to use agency authorized less-than-lethal weapons.

**1.3.5** – A written directive specifying the necessity for providing appropriate medical aid after the use of force by agency personnel when an injury is known, an injury is suspected, or an injury is alleged.

**1.3.6** – A written directive requiring a use of force investigative report, adopted by the agency, to be submitted to the agency Chief Executive Officer or designee whenever any agency personnel:
a. discharges a firearm, other than for routine training or recreational purposes;
b. takes any action that results in, or is alleged to have resulted in, any injury to another person; or
c. uses physical forces, or is alleged to have used physical force, to another person.

**1.3.7** – A written directive describing the agency policy regarding the assignment/ reassignment of agency personnel whose actions resulted in a death or serious bodily injury to another person, pending investigation and any possible administrative adjudication.

**1.3.8** – A written directive requiring that only weapons and ammunition approved and authorized by the agency shall be carried and/or used by its sworn personnel. This directive shall apply to both on and off duty weapons, as well as ammunition, and it shall address:
a. the types and specifications of all lethal and less-than-lethal weapons authorized for use;
b. the types and specifications of ammunition authorized for use;
c. the procedure for review, inspection, and prior approval of all weapons intended for use by a qualified weapons instructor or agency armorer before authorization is granted; and
d. a process for maintaining a record by the department on each weapon authorized by the agency for official use and the procedure for updating and expunging the written record.

**1.3.9** – A written directive requiring that agency personnel demonstrate satisfactory skill and proficiency of agency-authorized weapon(s) before approval is granted to carry and/or use such weapon(s).

**1.3.10** – A written directive requiring all agency personnel authorized to carry weapons to receive in-service training, at least annually, on the agency's use-of-force and deadly force policies and to demonstrate satisfactory skill, proficiency and qualification with all approved lethal weapons that the employee is authorized to use. In-service training for less-than-lethal weapons shall occur at least once every two years. The training requires:
a. skill and qualification training to be evaluated by a certified instructor;
b. training and qualification shall be documented;
c. the agency shall have procedures for remedial training for an employee unable to exhibit proficiency/qualification with an authorized weapon; and
d. if the agency authorizes the use of neck restraints or similar control techniques, which have the potential for serious injury, those procedures shall be included in the annual inservice use of force training.

**1.4.1**- A written directive establishing the command protocol and procedures, at a minimum, for the following situations:
a. absence of the Chief Executive Officer;
b. exceptional situations;
c. situations involving personnel of different functions engaged in a single operation; and
d. routine day-to-day operations.

**1.4.2** – A written directive requiring agency personnel to obey any lawful order of a superior officer, including any order relayed from a superior officer through an employee of the same or lesser rank. The directive shall also include procedures to be followed by an employee who

receives a conflicting or unlawful order.

1.4.3 – The agency has a written directives system that, at a minimum, includes the following:
a. agency mission and values statement;
b. agency policy statement that identifies the chief executive officer of the agency with the authority and responsibility to issue, modify, or approve agency written directives;
c. identifies, in addition to the chief executive officer, the person(s) or position(s) authorized to issue appropriate written directives when deemed necessary;
d. processes for indexing, purging, updating, and revising agency directives; and
e. methods for the review of proposed policies, procedures, rules and regulations prior to their issuance.

1.4.4 – The agency has written procedures for the release and for the storage of agency written directives, which includes the following minimal requirements:
a. methods for the dissemination of directives to affected personnel;
b. procedures for reasonable retrieval of the directives; and
c. process to acknowledge receipt and review of directives distributed to affected personnel.

1.5.1 – The agency has documented standards and hiring criteria for both full-time sworn law enforcement officers and, if applicable to the agency, part-time sworn law enforcement officers.

1.5.2 - Basic training requirements for part-time sworn personnel shall be identical to those for full-time officers.

1.5.3 - Part-time law enforcement officers shall receive in-service training identical to the inservice training for full-time law enforcement officers.

1.5.4 - Training requirements for use-of-force and firearms proficiency/qualification for part-time sworn personnel shall be identical and with the same frequency as full-time officers.

1.5.5 - A written directive requiring that all non-sworn personnel receive training appropriate for their duties or anticipated duties.

1.6.1 - A written directive governing the maintenance of all cash funds or accounts where agency personnel are permitted to receive, maintain, or disburse cash and includes, at a minimum:
a. a balance sheet, ledger, or other system that identifies initial balance, credits (cash incomes received), debits (cash disbursed), and the balance on hand;
b. receipts or documentation for cash received;
c. authorization for cash disbursement, included CEO authorization for expenses in excess of a given amount;
d. records, documentation, or invoice requirements for cash expenditures;
e. persons or positions authorized to disburse or accept cash; and
f. a quarterly accounting of agency cash activities.

1.7.1- If the agency permits sworn personnel to engage in extra duty employment where the actual or potential use of police powers is possible or expected, a written directive addressing:
a. the requirement that sworn personnel must receive agency permission to engage in extra duty employment;
b. policies that address the behavior and activities of officers during extra duty employment;
c. approval, review, and revocation processes pertaining to extra duty employment;
d. to oversee adherence to the aforementioned policies, processes, and other matters deemed necessary or appropriate by the agency; and
e. written documentation of the significant aspects of each officer's extra duty employment in relation to the needs of the department.

April 26, 2007

4

**1.8.1** - Directives specify a code of conduct and mandatory appearance guidelines for all agency personnel.

**1.8.2** - A written directive prohibiting sexual and any other forms of unlawful or improper harassment or discrimination in the work place and providing guidelines about reporting the unlawful or improper conduct, including how to report the inappropriate conduct if the offending party is in the complainant's chain of command.

**1.8.3** - A written directive governing bias based policing that includes, at minimum the following:
a. prohibition against all forms of bias based policing;
b. initial and in-house refresher training on agency policy and bias based policing issues provided at least once every 3 years for sworn personnel in a format determined by agency;
c. corrective measures if bias based policing occurs; and
d. annual administrative review of agency compliance to its bias based policing directives and any citizen concerns or complaints that have been received.

**1.9.1** - A written directive requiring that a background investigation is conducted for each candidate for a sworn position prior to appointment, which includes at a minimum:
a. verification of qualifying credentials;
b. a review of any criminal or non-criminal record; and
c. verification from at least three personal references.

**1.9.2** - A written directive requiring that a medical examination is performed by a licensed physician and that a drug screening is conducted, prior to appointment, to certify the general health of each candidate for a sworn position.

**1.9.3** - A written directive requiring that a psychological fitness and an emotional stability examination is conducted by a licensed psychologist, prior to appointment, to certify the mental health and emotional stability of each candidate for a sworn position.

**1.10.1** - A written directive requiring the agency maintains and updates the training records of all employees.

**1.10.2** - A written directive requiring the agency, at a minimum, to maintain certain records of each training class it conducts, to include:
a. course content (lesson plans);
b. name of all attendees; and
c. performance of individual attendees and the measuring instruments/tests used, if applicable.

**1.10.3** - A written directive requiring all sworn members of the law enforcement agency to successfully complete a certified basic law enforcement/police training course prior to assuming their law enforcement duties.

**1.10.4** - A written directive establishing a field training program for all newly sworn officers with a curriculum based on tasks of the most frequent assignments with provisions for the following:
a. field training of at least four weeks after the required classroom training;
b. a selection process for field training officers;
c. supervision of field training officers;
d. liaison with academy staff, if applicable;
e. training and in-service training of field training officers;
f. rotation of recruit field assignments;
g. guidelines for the evaluation of recruits by field training officers; and
h. reporting responsibilities of field training officers.

April 26, 2007

**1.10.5** – A written directive requiring all sworn members of the law enforcement agency to successfully complete an annual in-service training course, which may include course materials on federal and Pennsylvania court cases and legal updates.

**1.10.6** – A written directive requiring that if the agency has a tactical team or other specialized operational unit, that all personnel assigned to the team or unit participates in in-service training and/or readiness exercises for tactical teams at least annually. Those activities and training must be documented and the records retained by the agency.

**2.1.1** – A written directive shall be prepared to establish appropriate procedures for responding to routine and emergency calls. It shall also include guidelines for the use of authorized emergency equipment that conforms with the provisions of the Pennsylvania Vehicle Code (Title 75) and Pennsylvania Department of Transportation Rules and Regulations.

**2.1.2** – A written directive governing pursuit of motor vehicles which conforms to the Pennsylvania Vehicle Code (75 Pa. C.S.A § 6341-6345) and other laws of the Commonwealth of Pennsylvania, to include:
a. evaluating the circumstances;
b. initiating officer's responsibilities;
c. designating secondary units' responsibilities;
d. specifying roles and restrictions pertinent to marked, unmarked, or other types of police vehicle involvement in the pursuit;
e. assigning dispatcher's responsibilities;
f. describing supervisor's responsibilities;
g. using stopping techniques;
h. specifying when to terminate pursuit;
i. engaging in inter-jurisdictional and/or jurisdictional pursuits involving personnel from the agency and/or other jurisdictions; and
j. establishing the procedures for reporting and for an administrative review of the pursuit which conforms to the laws and regulations of the Commonwealth of Pennsylvania.

**2.1.3** – The agency makes available protective soft body armor for all sworn personnel assigned to uniform field duty and a directive establishes written guidelines for the wearing and availability of those vests.

**2.1.4** – A written directive requiring the wearing of protective bullet resistant vests by agency law enforcement personnel engaged in pre-planned, high- risk incidents.

**2.2.1** – The agency has written contingency plans for responding to natural and manmade disasters, civil disturbances, and other unusual occurrences as determined by the law enforcement agency.

**2.3.1** – A written directive requiring all complaints against the agency or its employees to be investigated and specifying:
a. complaints that require investigation by supervisory personnel;
b. complaints that require investigation by the Chief Executive Officer, or designee;
c. all complaint investigations shall be reviewed by the Chief Executive Officer, or designee; and
d. an equitable adjudication process determined by the agency.

**2.4.1** – A written directive establishing consistent procedures for taking vehicle enforcement action in relation to traffic law violations, to include:
a. physical arrests;
b. traffic citations;

April 26, 2007

6

c. traffic ordinance violations;
d. parking violations; and
e. written or verbal warnings.

**2.4.2** - A written directive describing the circumstances warranting the use of motor vehicle immobilization devices or other vehicle stopping techniques and which specifies the procedures for correct implementation.

**2.5.1** - A written directive that requires the transporting officer to thoroughly search the prisoner prior to transport.

**2.5.2** - A written directive requiring a thorough search at the beginning of each shift of all vehicles used for transporting prisoners and the search of any transport vehicles prior to and after transporting prisoners.

**2.5.3** - A written directive prescribing necessary actions at the destination by officer(s) transporting prisoner(s) to any facility, to include at a minimum:
a. securing firearms for safekeeping;
b. removing restraining devices just prior to securing the prisoner in the cell;
c. delivering documentation to the receiving officer;
d. documenting the transfer in a report and/or obtaining a signed receipt for the prisoner, attached to the report; and
e. advising the receiving personnel of any potential medical or security concerns or hazards posed by the prisoner.

**2.5.4** - A written directive describing the procedures to be taken by the transporting officer(s) in the event of an escape of a prisoner in transit, the officer(s) shall be aware of:
a. persons to be notified;
b. reports to be prepared; and
c. any further required actions to be taken.

**2.5.5** - A written directive requiring that agency personnel notify the appropriate agency or court officials when a prisoner is to be transported to another agency or court and is considered an unusual security risk.

**2.5.6** - A written directive regarding restraining devices and the methods to be used during prisoner transports with necessary exceptions noted.

**2.5.7** - A written directive prescribing the procedures for transporting sick, injured or disabled prisoners.

**2.5.8** - A written directive establishing procedures for the security and control of prisoners transported to medical care facilities or hospitals for treatment, examination or admission.

**2.6.1** -- If the agency has a court security function, directives shall include:
a. clear description of the agency's role and authority for court security;
b clearly defined policy and procedure on court security for agency personnel assigned to the function; and
c. identification of a position in the agency responsible for the security function.

**2.6.2** -- The court security function is developed to meet the court's needs, and addresses at a minimum:
a. facilities;
b. equipment; and
c. plans/procedures based on a documented survey conducted every three years.

April 26, 2007

7

**2.6.3** – If there is a prohibition against weapons in certain areas of the court, lockboxes will be made available.

**2.6.4** – A written directive that governs use of restraints on persons in custody while in the courtroom.

**2.6.5** – Equipment used for the court security function shall be specifically identified, available for immediate use and maintained in a state of readiness.

**2.6.6** - All courtrooms shall be equipped with at least one means of external voice communication.

**2.6.7** – All courtrooms shall be equipped with duress alarms.

**2.7.1** – Information regarding each item of legal process, civil and/or criminal, shall be recorded and include, at minimum, the following elements:
a. date and time received;
b. type of legal process, civil or criminal;
c. nature of document;
d. source of document;
e. name of plaintiff/complainant or name of defendant/respondent;
f. officer assigned for service;
g. date of assignment;
h. court docket number, warrant number, or other identifying number; and
i. date service is due or date of service.

**2.7.2** – A record of the execution or attempted service of legal process documents shall be maintained and include at minimum, the following elements:
a. date and time service was executed/attempted;
b. name of officer(s) executing/attempting service;
c. name of person on whom legal process was served/executed;
d. method of service/reason for non-service; and
e. address of service/attempt.

**2.7.3** – A written directive that governs the service of civil process documents.

**2.7.4** – A written directive that states the execution of orders for civil arrest or writs requiring the seizure of real or personal property is to be performed by a sworn law enforcement officer.

**2.7.5** – Written directives that govern the execution of criminal process.

**2.7.6** – A written directive that states arrest warrants are executed by sworn law enforcement officers only.

**2.7.7** – A written directive requiring that all property acquired through the civil process function is accounted for in agency records and is disposed of by the agency pursuant to legal authority.

**3.1.1** – A written directive requiring that agency personnel receive training on the operations of the cell area, to include the use of fire suppression and other emergency equipment provided by the agency.

**3.1.2** – A written directive that cells provide the listed minimum conditions for detainees:
a. adequate lighting;
b. circulation of fresh or purified air;
c. availability of a flush toilet;
d. source of potable drinking water;
e. access to wash basin or shower for a detainee held in excess of eight hours;

April 26, 2007

f. bed and bedding for each detainee held in excess of eight hours; and
g. any other standards required under the laws and regulations of the Commonwealth of Pennsylvania and/or its political subdivisions.

3.1.3 – A written directive requiring the cell area to have an automatic fire alarm, a heat and smoke detection system, fire fighting equipment approved by local fire officials, and a written plan prescribing fire prevention practices and procedures to include:
a. a weekly documented visual inspection and a semiannual documented testing of fire equipment; and
b. a daily visual inspection and required documented testing of the automatic fire detection devices and alarm systems in accordance with the law and local fire code regulations.

3.1.4 – A written directive requiring that there is a posted emergency evacuation plan for the cell area and a designated emergency exit directing evacuation of persons to a hazard-free area.

3.1.5 - A written directive requiring the agency to have a specific policy regarding firearm handling and firearm security in the cell area.

3.1.6 – A written directive requiring a complete security check, including a thorough search for weapons and contraband, prior to the use of an unoccupied cell.

3.1.7 – A written directive that requires supervised monitoring of tools and culinary equipment in the cell.

3.1.8 – A written directive requiring the agency to have a system in the cell area to alert the designated control center of an emergency.

3.1.9 – A written directive establishing procedures for a search of the detainee in the cell to include:
a. a complete inventory search of the detainee at the time of booking prior to entry into the cell; and
b. an itemized inventory of all property taken from the detainee.

3.1.10 – A written directive requiring the secure storage of any items taken from cell detainees.

3.1.11 – A written directive requiring that an intake form, developed by the agency, shall be completed for every person booked into the cell and that it contains at least the following information:
a. personal identification information;
b. arrest information;
c. property inventory and disposition;
d. current health of the detainee;
e. medications taken by the detainee;
f. behavior, involving state of consciousness and mental status; and
g. any body deformities, trauma markings, bruises, etc.

3.1.12 - A written directive specifying the procedures required for the detention and separation of males and females within the cell(s). If adults and juveniles are detained at the same time, their detention areas shall be separated from each other by sight and sound and in conformance to the laws and regulations of the Commonwealth of Pennsylvania.

3.1.13 – A written directive prescribing methods for holding, detaining, and segregating persons in the cell(s) who are under the influence of alcohol, drugs, or who are violent or self-destructive.

3.1.14 – A written directive prescribing space arrangements and procedures to follow in the event of group or mass arrest situation that exceeds the maximum capacity of the cell area.

**3.1.15** – A written directive requiring the identity of any detainee released from the cell be verified prior to release.

**3.1.16** – A directive requiring that when a detainee's property is returned upon release or transfer from the cell that the return of the property shall be documented on an agency form.

**3.1.17** – A written directive, approved by a licensed physician, identifying the policies and procedures to be followed when a detainee is in need of medical assistance.

**3.1.18** – A written directive requiring first aid kits are available in all areas of the cell area and which are inspected weekly and replenished when necessary.

**3.1.20** – A written directive controlling the distribution, and requiring documentation, of all pharmaceuticals within the cell, to include all medically approved medications belonging to or in the possession of the detainee.

**3.1.21** – A written directive requiring supervision of detainees by agency staff, including establishment of procedures to ensure that:
a. observation, whether by physical or electronic (video and audio) means, occurs at least every thirty minutes;
b. observation provides reasonable assurance that the safety and welfare of the detainee is adequately addressed;
c. observation is accomplished by persons in the same structure;
d. there is an immediate response, including a maximum time limit until arrival with a back-up system in case of non-availability; and
e. non-sworn respondents are trained to recognize potential medical emergencies, provide medical assistance and have been adequately trained in self defense to protect themselves in cases of assault or subterfuge.

**3.1.22** – If audio and/or electronic surveillance equipment is used for detainee supervision in the cell, that the equipment will be regulated to allow the detainees to have a reasonable expectation of privacy.

**3.1.23** – If the agency permits visitors, a written directive governing the procedures for visits to detainees in the cell area shall be prepared.

**3.2.1** – A written directive describing the use of temporary holding areas, which identifies the following procedures:
a. supervision and accountability for temporary detainees;
b. authorization for use of the temporary holding area;
c. temporary restraint of detainees by securing them to fixed objects; and
d. separation of adults and juveniles in accordance with the laws and administrative regulations of Pennsylvania.

**3.2.2** – A written directive establishing the minimum physical conditions for the temporary holding area and requiring access to potable water and a toilet.

**3.2.3** – If a detainee is to be secured to an immovable object, a written directive shall be prepared that identifies which objects were designed and intended for such use within the temporary holding area.

**3.2.4** – A written directive requiring a plan for fire prevention, fire evacuation and fire suppression for the temporary holding area.

**3.2.5** – A written directive addressing the following security concerns in the temporary holding area:

April 26, 2007

10

a. weapons control;
b. panic or duress alarms;
c. access to area and prisoner;
d. escape prevention;
e. search of detainee;
f. security inspection;
g. detainee shall be physically attended; however
h. the detainee may be left unsupervised for a period of no longer than 10 minutes when secured.

**3.2.6** – A written directive requiring training for all agency personnel who will have any responsibility for detainees in temporary custody within the temporary holding area.

**3.3.1** – The agency has 24 hour, two-way radio capability providing continuous communication between a communications center and the officer(s) on duty.

**3.3.2** - The agency has the capability of immediate playback of recorded emergency telephone and radio communications while it maintains a continuous recording of radio transmissions and emergency telephone communications to and from the communications center and directives provide for:
a. a requirement that recordings be retained for a minimum period of 30 days;
b. secure handling and storing for the recordings; and
c. criteria and written procedures for reviewing recorded conversations.

**3.3.3** - If the agency authorizes first aid / lifesaving instruction to be given over the telephone or by radio, agency employees shall be appropriately trained and have immediate access to approved emergency medical guidelines and materials.

**3.3.4** – The agency has an alternate source of electrical power that is sufficient to ensure continued operation of emergency communication equipment in the event of the failure of the primary power source and documents inspection and test procedure of the alternate power source completed at least monthly or in conformance with manufacturer recommendations.

**3.4.1** - A written directive provides for a uniform field reporting system for the law enforcement agency to include:
a. guidelines to indicate when reports must be completed;
b. designated forms to be used in field reporting;
c. data required to be included in field reports;
d. procedures to be followed in completing field reports; and
e. process for submitting completed field reports.

**3.5.1** - A written directive that requires qualified personnel to be available on a 24-hour basis to process crime scenes, traffic crash sites, and other investigation scenes.

**3.5.2** - A written directive shall be prepared by the agency regarding documentation for the custody of physical evidence. The directive will provide guidance to agency personnel about the necessity for keeping written or computer records of all transactions of physical evidence in the custody of the agency.
The record of any transaction and/or transfer involving physical evidence shall, at a minimum, include:
a. name of person possessing the evidence collected for processing or storage;
b. the date and time of every transaction/transfer;
c. name of the person receiving the evidence;
d. reason for the transaction/transfer;
e. name and location of any laboratory and/or agency where the evidence was transferred;

April 26, 2007

11

f. type of examination(s) requested or the reason for the transfer of the evidence; and
g. any other pertinent information relating to the transaction/transfer of the evidence.

**3.6.1** - A written directive that establishes procedures for receiving evidence and recovered property obtained by agency personnel for retention into agency custody and control, to include:
a. requiring all evidence/property to be logged into agency records as soon as possible;
b. requiring all evidence/property to be placed under the control of the property and evidence control function before the end of the tour of duty of the officer/technician;
c. requiring a written report detailing the circumstances by which the evidence/property came into the agency's possession and describing each item of evidence/property obtained;
d. providing guidelines for packaging and labeling of evidence/property prior to storage;
e. establishing extra security measures for handling exceptional, valuable, or sensitive items of evidence/property;
f. requiring an effort to identify and notify the owner or custodian of recovered property in the custody of the agency; and
g. establishing procedures for the final release of recovered property items from the control of the law enforcement agency.

**3.6.2** - A written directive requiring evidence and recovered property to be stored within designated and secure areas and/or facilities that are under the direct control of the law enforcement agency.

**3.6.3** - A written directive ensuring that secure facilities are available and used for the storage of evidence or recovered property during periods when the property room is closed.

**3.6.4** - A written directive requiring that only authorized personnel have access to areas used by the agency for storage of in-custody or evidentiary property.

**3.6.5** - A written directive requiring that a record system be implemented to reflect the location and status for all evidence and recovered property held by the agency.

**3.6.6** - A written directive requiring the following documented inspections, inventory, and audits shall be completed:
a. an inspection to determine adherence to procedures used for the control of evidence / recovered property is conducted annually by the person responsible for that function or designee;
b. an inventory of property occurs whenever the person responsible for the evidence / recovered property control function is assigned to and/or transferred from that position and is conducted jointly by the newly designated property custodian and a designee of the CEO to ensure that records are correct and properly documented;
c. a complete inventory of all items and records must be conducted when there is reason to believe that evidence has been tampered with, or if the evidence custodian has been removed for any irregularities;
d. an annual audit of property held by the agency is conducted by a supervisor / commander not routinely or directly connected with control of evidence / property; and
e. unannounced inspections of evidence and property storage areas are conducted as directed by the agency's Chief Executive Officer.

**3.7.1** - A written directive outlining the importance of physical fitness for law enforcement agency personnel, which encourages their participation in a physical fitness program.

**3.7.2** - A written directive explaining the importance of a total wellness program for law enforcement officers and agency personnel that encourages their participation in a total wellness program.

**4.1.1** - A written directive regarding the legal mandate that the law enforcement agency comply

April 26, 2007

12

with Section 3741-3755 of the *Pennsylvania Vehicle Code* (Title 75) in regard to the reporting requirements for "Accidents and Accident Reports" including:
a. 3746(c) requiring investigation by a police officer within criteria of 3746 (a) (1 & 2).
b. 3751(a) initial reports forwarded to PennDOT within 15 days.
c. 3751(b) copies of reports, furnished at cost, as indicated.
d. 3752(b) only approved forms use.

**4.1.2** - A written directive regarding the legal mandate that the law enforcement agency comply with Sections 6341-6345 of the *Pennsylvania Vehicle Code* (Title 75) in regard to the reporting and recording requirements for "Pursuit of Vehicles" including:
a. 6342(c)(1) criteria or principals for initiation of pursuit.
b. 6342(c)(5) traffic regulations including use of emergency equipment, visual, and audio signals.
c. 6343 submission of reports to PSP.

**4.1.3** - A written directive regarding the legal mandate that the law enforcement agency comply with Section 2908 of the *Pennsylvania Crimes Code* (Title 18) in regard to the duties of law enforcement agencies with respect to missing children including:
a. 2908(a)(1) investigating immediately regardless of age or circumstance.
b. 2908(a)(2) recording on reports all relevant information and circumstances.
c. 2908(a)(3) entering into the Missing Persons File of CLEAN.
d. 2908(a)(3.1) entering into the Unidentified Persons File of CLEAN upon:
(i) taking into custody an unidentified child.
(ii) discovering an unidentified deceased child.
e. 2908(a)(4) insuring timely cancellation of a CLEAN entered child who is returned or located.
f. 2908(a.1) entering an unidentified deceased child into the CLEAN Unidentified Persons File.

**4.1.4** - A written directive regarding the legal mandate that the law enforcement agency comply with Section 9112 of the *Pennsylvania Crimes Code* (Title 18) in regard to mandatory fingerprinting requirements including:
a. 9112(a) fingerprints of designated persons taken and forwarded to the Central Repository within 48 hours.
b. 9112(b)(1) per specified private complaints, fingerprinting upon court direction, forwarded within 48 hours.
c. 9112(b)(2) for summons or 3929 offenses, fingerprinting upon court direction, forwarded within 48 hours.
d. 9112(c) the PSP Central Repository to transmit Criminal History information to submitting agency.

**4.1.5** - A written directive regarding the legal mandate that the law enforcement agency comply with the *Pennsylvania Crime Victims Act* (18 P.S. 11.101 et seq.) in regard to responsibilities of state and local law enforcement agencies including:
a. 11.212(a) all officers and employees are familiar with crime victims' compensation and information is included in trainees' curriculum.
b. 11.212(b)(1) a notice to victim or family member, provided within 48 hours of report, of availability of crime victim's compensation. Notice to be in writing and in a manner and form developed by the Office of the Victims' Services.
c. 11.212 (b)(2) basic information on the rights and services available for crime victims provided in writing within 24 hours of the first contact and in a manner and form developed by the Office of Victims' Services.
d. 11.212(c) an application form for crime victims' compensation provided with subsection 11.212 (b)(1) notice.
e. 11.212(e) form, developed by the Office of Victims' Services, with victim check off signifying receipt of information, attached to report.
f. 11.212(f)(1) the agency making a reasonable effort to notify personal injury crime victims

of suspect arrest, within 24 hours of arrest, filing or forwarding of complaint.
g. 11.212(f)(2) the agency notifies personal injury crime victims if suspect escapes from agency's custody.
h. 11.212(g) victim's property seized as evidence, returned, if prosecutor determines evidence no longer needed.

**4.1.6** - A written directive regarding the legal mandate that the peace officers or law enforcement officials of the law enforcement agency comply with Section 6311 of the *Pennsylvania Child Protective Services Law* (23 Pa.C.S.A.§6301, et seq.) in regard to persons required to report suspected child abuse per section 6313(a), immediately by telephone and in writing within 48 hours.

**4.1.7** - A written directive regarding the legal mandate that the law enforcement agency comply with Section 6308 of the *Pennsylvania Juvenile Act* (42 Pa. C.S.A. § 6301, et seq.) in regard to law enforcement records including:
a. 6308(a) juvenile records and files are kept separate from adult arrest files.
b. 6308(b) juvenile records and files are not released to public.
c. 6308(c) conditions when photographs and fingerprints of a juvenile may be taken for felony and misdemeanor charges.

**4.1.8** - A written directive regarding the legal mandate that the law enforcement agency comply with Sections 9798 and 9797 of the *Pennsylvania Judicial Code* (Title 42) in reference to written notifications made by the police department in the municipality where a sexually violent offender resides as required by 42 Pa..C.S.A.§9791, et seq. including:
a. 9798(a)(1) the Chief Law Enforcement Officer of the municipality where a sexual predator lives providing notice containing information required in (i) through (v) of the subsection.
i. name of the convicted predator.
ii. address(s) which he resides.
iii. offense convicted of.
iv. determined by court order to be a sexually violent predator and order is current.
v. photograph of predator, if available.
b. 9798(b) notifications to persons designated in subsections 1 through 5.
(1) neighbors of predator.
(2) director of county children and youth service agency in county where the predator resides.
(3) superintendent or equivalent, of each school district, private and parochial schools enrolling students up through grade 12 in the municipality where the predator resides or is located within one mile of where he resides.
(4) licensee or owner/operator of each certified day care center, licensed preschool program or registered family day care home in the municipality where the predator resides.
(5) president of each college, university and community college located within 1,000 feet of a predator's residence.
c. 9798(c) notifications within time frames indicated in subsections 1 and 2.
(1) neighbors, within 5 days after information of the predator's release date and residence has been received by the chief law enforcement officer. Verbal notification may be used if written notification would delay meeting this time requirement.
(2) all others may be provided information with 7 days of notification of release.
d. 9798(d) all information indicated in 9798(a) shall be available, upon request, to the general public. Information may be provided by electronic means.
e. 9798(e) sections applicability to interstate parolees designated as sexually violent offenders.
f. 9797 (a)(1) when an individual is determined to be a sexually violent predator under section 9795.4, the local municipal department or the Pennsylvania State Police where no municipal police jurisdiction exists shall give written notice to the sexually violent

April 26, 2007

14

predator's victim. This notice must be given within 72 hours after the agency receives official notification of a change in address. The notice shall contain the predator's name and address(es) where he resides.

**4.1.9** - Compliance with the requirements of the *Pennsylvania Municipal Police Officers' Education and Training Act*, as amended, (53 Pa.C.S.A.§2161, et seq.) in regard to municipal police officer training and agency responsibilities including:
a. 2164(8) physical fitness standards and educational prerequisites to employment.
b. 2164(12) certification of all officers.

**4.1.10** - A written directive regarding the legal mandate that the law enforcement agency comply with the requirements of the *Pennsylvania Protection From Abuse Act*, as amended, (23 Pa. C.S.A.§6101, et seq.) in regard to the responsibilities of law enforcement agencies under the provisions of Section 6105 including:
a. 6105(a) a written domestic violence policy and information included in trainees' curriculum.
b. 6105(b) the agency providing abused persons with oral and written notification of the availability of a safe shelter and domestic violence services in the community. The written notice is to be in English and Spanish, including the required statement.
c. 6105(d) the agency making a reasonable effort, within 24 hours of arraignment, to notify an adult or emancipated minor protected by an order of an arrest.
d. 6105(e) PSP establishing a statewide registry of protection orders, available at all times.

**4.1.11** – A written directive regarding the legal mandate that the law enforcement agency comply with section 6326 of *Pennsylvania Juvenile Act* (42 Pa.C.S.A.§6321, et. seq.) in regard to temporary detention of child:
a. 6326(b) detention in a lockup where adult prisoners are housed is generally prohibited.
b. 6326(c) a child in custody due to crime, summary offense, violation of probation or supervision following adjudication of delinquency may be held in secure custody in adult lockup when:
(1) held for identification, investigation, processing, releasing or transferring to parent, guardian, other custodian, juvenile officials, or shelter.
(2) time limited to complete processing, but no more than six hours.
(3) separated by sight and sound from adults and under continuous observation.
c. 6326(d) non-secure custody of child in facility with adults is appropriate when:
(1) unlocked multipurpose area or area used only for processing purposes.
(2) not physically secured in any way.
(3) non-secure custody only long enough to accomplish purpose.
(4) continuous visual supervision occurs.
d. 6326(e) reports of children held per 6326(c) and (d) provided to PCCD as requested.

**4.1.12** – Comply with the *Pennsylvania Right to Know Act*, (Act 100 of 2002) in regard to responsibilities of state and local law enforcement agencies including:
a. Section 8(a) establishing written policies and promulgating regulations necessary to implement this act.
b. Section 8(b) policies shall include the name of the office to which requests for access shall be addressed and a list of applicable fees.
c. Section 8(c) a policy or regulation may not include:
(1) limitation on the number of public records, which may be requested or made available for inspection or duplication.
(2) A requirement to disclose the purpose or motive in requesting access to records, which are public records.
d. Section 8(d) policies shall be conspicuously posted at the agency and may be made available by electronic means.

April 26, 2007